2020 IL App (3d) 160350

Opinion filed November 19, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0350 Circuit No. 14-CF-1758 |
| | ) | |
| DRUMAINE S. McKINLEY, | ) ) | Honorable Carla A. Policandriotes, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices Holdridge and Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found defendant, Drumaine S. McKinley, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)). The jury also found the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant filed a motion for a new trial, which the trial court denied. Following a sentencing hearing, the trial court sentenced defendant to natural life in prison. Defendant filed a motion to reconsider, which the trial court denied. Defendant appealed, arguing (1) the State failed to give him proper notice of its intent to seek an increased sentence of natural life in prison based on allegations that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and (2) the trial court

showed an impermissible bias in favor of the State by showing extraordinary sympathy for the victim's family, acting as an advocate for the State by interpreting a comment made by the prosecutor in a manner to avoid creating an issue on appeal, and calling defendant "garbage" who lived in a "garbage dump" at the sentencing hearing. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged with the first degree murder of Joslyn Woods. Prior to trial, defendant filed a motion *in limine* to prevent the State from showing the jury a slow-motion version of a video of defendant stabbing Joslyn. The trial court ruled that the slow-motion video could be shown if the State laid a proper foundation as to how the video had been altered and first showed the unaltered version of the video to the jury.

¶ 4      On Monday, February 29, 2016, prior to jury selection, the State filed a notice of its intent to seek an increased sentence of natural life in prison, which indicated the State would be requesting the jury to find beyond a reasonable doubt that the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." Defendant's counsel was given a copy of the notice in open court. Defendant's attorney was also notified of the State's intent on Friday, February 26, 2016, although it is not clear whether that notice was provided in writing. Defendant's attorney objected to the timeliness of the State's notice. The trial court found that the State had given defendant sufficient notice of its intent to seek an increased maximum sentence of life in prison based upon a jury finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. A jury was then selected. The following day, the parties gave their opening statements. The trial continued to proceed for several days, and, after deliberations, the jury found defendant guilty of

2

first-degree murder and that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 5 Defendant filed a motion for new trial, arguing, among other things, that he did not receive timely notice of the State's intent to seek a finding of exceptionally brutal or heinous behavior. Defendant's attorney argued that if the defense had been given timely notice of the State's intent to seek such a finding, it would have affected how the defense's investigator talked to witnesses and how defendant's attorney prepared and argued the motion *in limine*. In response, the attorney for the State argued that the slowed-down version of the video was played for the jury for the purpose of disproving defendant's claim of self-defense and the brutal or heinous nature of the murder was evident in the video played at regular speed. The attorney for the State also contended that its notice was timely and that the State seeking an exceptionally brutal or heinous behavior finding did not change the discovery or the nature of the trial.

¶ 6 The trial court stated that the nature of the case, discovery, and any obligation the State had toward defendant in preparation for trial had not changed based on the State's intent to seek an exceptionally brutal or heinous finding. The trial court noted the parties "knew exactly what type of evidence" would be presented and how the State would be presenting it and the videos, police reports, and evidence could not be viewed without an indication of defendant's behavior or the victim's manner of death. The trial court found that the State's notice was "quite reasonable" in that there was "nothing different of any substance that the defense would do or not do in preparation of trial" and denied defendant's motion for a new trial.

¶ 7 During the sentencing hearing, four of Joslyn's family members gave statements to the court regarding the impact of Joslyn's death on them. Joslyn's younger sister, G.W., requested

3

that she be allowed to have her sister stand next to her as she read her statement to the court, which was allowed. The following colloquy took place:

"THE COURT: You're both so beautiful. How am I supposed to tell the difference? Who is 11-years old? My gosh, you are so mature looking. So you would like to read your own victim impact statement, but it's going to help you by having this other young lady stand next to you?

[G.W.]: Yes.

THE COURT: What is your name?

[R.W.]: R.W. (phonetic).

THE COURT: What's your last name?

[R.W.]: W[.]

THE COURT: How are the two of you related to each other?

[R.W.]: Sisters.

THE COURT: [Defendant's attorney], I have one sister who wants to read her own statement and have her other sister stand next to her to do so. Any objection?

[DEFENDANT'S ATTORNEY]: No, your Honor.

THE COURT: Okay. G.W., it's hard to read in court. I have been doing this 15 years. You can't imagine how hard it is. Because what happens is as we read, we keep going faster and faster. My court reporter then starts screaming out loud, oh, my gosh. This is what I'm going to do. I am going to follow along with you. If I think you are going maybe a little too fast, I may say, [G.W.], slow down for me. Okay? If you need a minute, you need to take a break, you do what you

4

have to do to get through it. Okay. Big deep breath. That always helps. Always helps. Okay? Whenever you are ready."

¶ 8        G.W. read her statement to the court. The attorney for the State indicated that Brittani Davidson, Joslyn's older sister, would be reading her statement to the court. Before Brittani read her statement, the trial court told her, "[d]eep breath. At your convenience." After Brittani read her statement, the attorney for the State indicated that Danielle Woods, the victim's stepmother, would be reading her statement. The trial court indicated to Danielle, "Ma'am, please take a deep breath and present when you are ready." Danielle started by stating her name and indicating that she was the stepmother of Joslyn Marie Woods. Then, the following conversation took place:

"THE COURT: Ms. Woods, if you have any difficulties, I can read it for you as you stand here and when you want to you can take over, if you would like. I'll help you with it if you would like. Give me just a moment. Or I believe your husband would be able to stand next to you if you would think that might give you more strength. How would you like me to help you?

MS. WOODS: I will try.

THE COURT: I'm going to ask you to do me a favor. If you look behind, your husband is standing right there. If you would like, he can stand next to you. I think that's an, okay, yes. [Defense counsel], you have no objection, do you?

[DEFENDANT'S ATTORNEY]: No."

¶ 9        Thereafter, Danielle read her statement to the court. The attorney for the State indicated the last statement would be made by Kathryn Hatcher, Joslyn's mother. The trial court indicated, "Ms. Hatcher, as I told the girls, deep breath." The trial court also told Kathryn to take her time. Kathryn began reading her statement but stopped about one-third of the way through. The trial

5

court stated, "[t]ake a sip of the water. I promise you it helps. It's right there. I don't know why it helps, but it helps." Thereafter, Kathryn finished reading her statement.

¶ 10　　　　The defendant's attorney indicated the defense had three witnesses to present, the first of whom was Carolyn Miller. The trial court instructed Carolyn to approach the clerk and raise her right hand, whereupon Carolyn was duly sworn. The trial court stated to Carolyn, "Ms. Miller, would you please take a seat here in the witness stand, make yourself comfortable." The trial court then asked the attorney for the State if the victim's family needed a moment before defendant's attorney began his examination. The attorney for the State responded, "[w]e're good." The trial court indicated to defendant's attorney, "[y]ou many proceed."

¶ 11　　　　After the defense witnesses testified, the attorney for the State made his closing arguments and requested a life sentence. The attorney for the State argued that the 37-year-old defendant had contributed nothing to society and had taken the life of the 20-year-old victim, who was "a daughter, sister, granddaughter, friend, and loved one to many." The attorney for the State argued that the victim died "in a horrifically brutal and cruel manner" at the hands of defendant, being stabbed by defendant within seven minutes of meeting him. The attorney for the State argued that no one could forget the look of sheer terror on the victim's face in the video and defendant had used "every bit" of his six-foot, four-inch, 300-pound body to punch the victim to the ground and repeatedly stab her. The attorney for the State noted that defendant had stopped stabbing the victim, stood over her, watched her, stabbed her again, walked out of the room, came back, continued to stab her, walked out again, came back, and "did it a fourth time." The attorney for the State indicated that within 12 minutes of her first interaction with defendant, the victim lay dead from injuries that were inflicted by defendant, which included multiple stab wounds that the coroner could not even count, saw wounds to the back of the victim's neck,

puncture wounds, and cuts to her face and head. The attorney for the State described defendant's criminal history, noting he was on parole at the time of this murder.

¶ 12 The attorney for the State also discussed the factors in aggravation. The attorney for the State indicated, "[t]he first one is that it obviously has caused harm," and he then discussed other factors in aggravation—an extensive history of criminal activity, a necessity to deter others, and the offense was committed while defendant was on parole. The attorney for the State also noted the jury's finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The attorney for the State requested that defendant be sentenced to life in prison.

¶ 13 The attorney for defendant argued against the imposition of a life sentence, noting that defendant had over 15 character witnesses that were willing to speak with him on defendant's behalf and that defendant did not have any violent felonies in his criminal history until this case. Defendant's attorney argued that a sentence in the normal sentencing range of 20 to 60 years of imprisonment would be more appropriate, noting that defendant's statement to police had been that the victim had a knife and defendant was acting in response to a strong provocation or in self-defense.

¶ 14 Defendant made a statement in allocution, apologizing to the victim's family. He stated:

> "I know a thousand I am sorries could never erase the pain and the hurt that I see on you all's face and the way you expressed in your letters. I sat in this courtroom month after month and witnessed you all pain. I am deeply sorry for the pain that I caused your family and the hurt and the hate I understand that you have towards me. I didn't intentionally set out that day to do this. All I could say is I am sorry. I understand the pain and the hurt that I caused you all. I didn't set

7

out to do it. I understand you may never be able to forgive me, but I pray to God to keep you all strong and help you get through. Your Honor, I didn't—I am not the type of person that just go out to hurt people, nothing like that. Yeah, I had run-ins in the law but—to do the criminal activity by selling drugs, but I wasn't a person that just go out to hurt people. I don't do nothing like that. I apologize for being in your courtroom under these circumstances. I really don't know what I can say besides hopefully one day that you all will be able to forgive me for my actions. And that's basically all I can say."

¶ 15    The trial court thanked defendant and indicated it had considered the statutory factors in aggravation and mitigation. The trial court then stated that it was making an accurate record, noting that when the attorney for the State suggested that the harm caused by defendant was an aggravating factor, the trial court believed he was referring to "harm to the family." The trial court indicated that with the nature of the charge (first degree murder), harm to the victim could not be an additional aggravating factor because that factor was included in the sentencing range. The trial court noted it had reviewed the presentence investigation (PSI) report, presided over the trial, and heard and read each of the victim impact statements.

¶ 16    The PSI report included a "victim effect" portion that was based on an interview with Joslyn's mother, Kathryn. Kathryn had indicated, in part, that Joslyn's "indiscretion" had been made public because of defendant's brutal actions and that she not only had to mourn her daughter's death but also had "to defend [her daughter's] character because the nature of [Joslyn's and defendant's] encounter."

¶ 17    The trial court noted that the PSI report indicated that the 37-year-old defendant had eight previous felony convictions and "multiple opportunities" to serve in the Department of

8

Corrections (DOC), in addition to misdemeanors and traffic matters. The trial court also noted that the jury had found defendant's conduct was exceptionally brutal or heinous indicative of wanton cruelty. The trial court further stated:

"[T] here is a huge range of discretion. *** Discretion is given to people who are also from this community who have life experiences, who have the opportunity to know that what they do every day is important and to know how awful it must be to wait in excess of two-and-a-half years to have some closure and to come to a building where nobody understands how challenging it must be to sit in that hallway and then come in and go out and come in and go out. My God. *** In this case, I get introduced through a victim impact statement to Joslyn's grandmother. And I listen to the manner in which she describes her little girl. And I could not not smile because I am so glad to know that this was Joslyn's life; the love, the affection, the family, the meals, the music, sisters loving each other one day and fighting the next. Right? And how rare it is for at least those of us who sit on the bench to hear that families that have blended families of half-siblings or step siblings and, you know, are able to set aside our adult pride or whatever because we know what's good for our kids as we raise them. So I'm very fortunate to learn about the nature of Joslyn's life and her family. What a brave little sister. Not many young ladies can stand in a courtroom like this for the reasons that you have done that. And I am sure you have a lot of Joslyn in you. That's pretty obvious. Right? Ms. Danielle Woods, you are an example for all of us who are not only mothers and wives, but also stepparents to know how important our role is every day. I am going to congratulate you on the relationship

9

that you were able to create with Joslyn from the time she was four-and-a-half years old. Ms. Hatcher, to the best that you can look around this side of the courtroom, you have continued love of and life experiences that can be shared with the other people in your life and you can bring Joslyn to them every day to every event. Who knows her better than you? Not possible. Right?

If you thought about the pain that you had suffered from losing your granddaughter or your daughter or your sister or cousin, your niece, you know, and as a part of this community ***, if there is anything that we have done post-death of Joslyn that made your pain one bit more, please accept my apologies and my continued condolences. I can read and I see here in the statements presented to me, particularly for yours, Ms. Hatcher, you know there's garbage in this world. That's a fact. Some people like to live in a garbage dump and they don't do well if there is not garbage. Apparently there is not enough stench for them. So they have to assist in making other people feel pain. So if you have ever read anything or were shown anything that wrote something about your daughter that was not the young lady that I now know so much about, you don't have to defend because you can't defend garbage. The best of our ability we—what we do is we feel sorry for them. Okay?

***

*** Okay. It's obvious to me that Joslyn was human. Go figure. Very resourceful, courageous, obviously very, very determined and loving. That didn't happen on its own. It happened based on the people who loved her and cared for her and raised her and were passionate around her. That's not gone. How could it

be gone? You have to take those same traits and keep going with it. Right? It's also an obligation on my behalf to look to what is the right thing for me to do based on my obligation regarding sentencing for [defendant] with the same open mind, the same necessity to look at every factor in mitigation that the attorneys have presented on [defendant's] behalf."

¶ 18 The trial court indicated that it had listened to defendant's mother and "the women that love [defendant]" (in reference to defendant's godmother and godsister). The trial court indicated it had "absolutely no comfort level" of ever letting defendant out of prison knowing that defendant had acted out "in such a brutal manner to a young lady in the manner in which [he] did." The trial court indicated that it was a "huge concern" that defendant would "do this potentially to someone else." The trial court noted there had been no history of defendant ever following rules and regulations or following social protocols when he was incarcerated in the DOC and on mandatory supervised release or parole. The trial court stated to defendant, "[you] didn't even follow the rules then when there was such a strong probability of going back to prison." The trial court sentenced defendant to life in prison.

¶ 19 Defendant filed a motion to reconsider the sentence, arguing, *inter alia*, that the State's notice of its intent to seek an extended-term life sentence based on defendant's brutal and heinous conduct was untimely. Defendant indicated that he was objecting to being sentenced to an extended term based on the State's late notification, arguing he should have only been sentenced within the normal sentencing range for first degree murder (20 to 60 years of imprisonment) and the trial court should not have considered an extended-term sentence. The trial court denied defendant's motion to reconsider.

¶ 20 Defendant appealed.

11

¶ 21                                    II. ANALYSIS

¶ 22        On appeal, defendant argues (1) the State failed to give the defense reasonable notice of its intent to seek a sentencing enhancement based on defendant's alleged exceptionally brutal or heinous behavior and (2) the trial court showed an impermissible bias in favor of the State and against defendant during the sentencing hearing.

¶ 23              A. Notice of Intent to Seek an Exceptionally Brutal or Heinous Finding

¶ 24        If an alleged fact (other than a prior conviction) is not an element of an offense but is used to increase the penalty beyond the statutory maximum, "the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111-3(c-5) (West 2016). The legislature enacted subsection (c-5) of section 111-3 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) in response to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that whenever a fact (other than a prior conviction) is considered to enhance a penalty beyond the statutory maximum, the trier of fact must find that fact was proven beyond a reasonable doubt. *People v. Davis*, 373 Ill. App. 3d 351, 360 (2007).

¶ 25        Under section 5-4.5-20 of the Unified Code of Corrections, the sentencing range for first degree murder is 20 to 60 years of imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2016)). Pursuant to section 5-8-1(a)(1)(b) of the Unified Code of Corrections, "if a trier of fact finds beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty *** the court may sentence the defendant *** to a term of natural life imprisonment." 730 ILCS 5/5-8-1(a)(1)(b) (West 2016).

¶ 26    Here, defendant argues that the State's timing of providing him with notice of its intent "to seek the most severe sentencing enhancement available was unreasonable." Defendant argues that had he been provided with more timely notice of the State's intent to seek such a severe sentencing enhancement (life in prison), it would have affected the defense's investigation into this incident and its motion *in limine* regarding the video evidence, as well as providing the defense "adequate time" to prepare to counter the State's allegations. Defendant acknowledges that the State's allegation of exceptionally brutal or heinous behavior for the purposes of seeking an increased maximum sentence was not a new charge.

¶ 27    As noted above, section 111-3(c-5) of the Code of Criminal Procedure provides that when the State intends to use a fact to increase a penalty beyond the statutory maximum, the alleged fact must be either included in the charging instrument or provided to the defendant through a written notification "before trial." 725 ILCS 5/111-3(c-5) (West 2016). Defendant does not argue that the statute is unconstitutional but that the statute should be interpreted as requiring the State to provide "reasonable" notice. We review matters of statutory interpretation *de novo*. *People v. Swift*, 202 Ill. 2d 378, 385 (2002).

¶ 28    The primary purpose of statutory interpretation is to give effect to the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute. *Id.* Where the meaning of a statute is plain, there is no need to resort to other tools of construction. *Id.* Here, the State gave notice of its intent to seek an increased sentence based on defendant's alleged exceptionally brutal or heinous behavior indicative of wanton cruelty "before trial," submitted that fact to the jury as an aggravating factor, and proved that fact beyond a reasonable doubt, in accordance with section 111-3(c-5) of the Code of Criminal Procedure. See 725 ILCS 5/111-3(c-5) (West 2016). Thus, the notice was timely.

13

¶ 29    Even if we interpreted section 111-3(c-5) of the Code of Criminal Procedure as requiring the State to provide "reasonable" notice, nothing in the record suggests the notice provided to defendant was unreasonable. Defendant argues that more timely notice of the State's intent to seek the sentencing enhancement would have affected his investigation into the incident and the defense's arguments regarding the motion *in limine* but provides no indication of how so, other than indicating the defense was not focused on the brutal or heinous issue. Also, defendant argues he was not given "adequate time" to counter the State's allegations. The record shows that defendant did not request a continuance for "adequate time" to do so, which would have been within the trial court's discretion to grant or deny. See *People v. Ward*, 154 Ill. 2d 272, 304 (1992) (a reviewing court will reverse the trial court's denial of a request for a continuance where the trial court abused its discretion and the denial somehow prejudiced the defendant). Based on the record before us, we cannot say that the timing of the State's notice was unreasonable.

¶ 30    We, therefore, conclude that defendant was given proper written notice of the State's intent to seek an exceptionally brutal or heinous finding in accordance with the plain language of section 111-3(c-5) of the Code of Criminal Procedure. See 725 ILCS 5/111-3(c-5) (West 2016).

¶ 31          B. Bias in Favor of the State and Against Defendant at Sentencing

¶ 32    Defendant also argues the trial court showed an impermissible bias in favor of the State and against him during sentencing, contending that the trial court showed extraordinary sympathy for the victim's family, acted as an advocate for the State by interpreting a comment by the prosecutor in a manner to avoid creating an issue on appeal, and called defendant "garbage" who lived in a "garbage dump." Defendant recognizes that he forfeited the issue of judicial bias by failing to raise it in the trial court but argues that this court should relax the

14

forfeiture rule or, alternatively, address the issue under a plain error review. The State contends that defendant forfeited this issue by failing to raise it in the trial court and argues that no error occurred to warrant a plain error review.

¶ 33     We acknowledge that the application of the forfeiture rule is less rigid where the basis for the objection is the trial judge's conduct. *People v. McLaurin*, 235 Ill. 2d 478, 485-86 (2009) (citing *People v. Kliner*, 185 Ill. 2d 81, 161 (1998) (although both an objection at trial and a written posttrial motion raising the issue are necessary to preserve an alleged error for review, application of the rule is less rigid where the basis for the objection is the trial judge's conduct) and *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963) (holding that judicial misconduct could provide a basis for relaxing the forfeiture rule)). We also acknowledge that plain error applies to a forfeited error affecting the substantial rights of a defendant when (1) the evidence in a case is so closely balanced or (2) the error is so serious that there is a substantial risk that defendant was denied a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). In the sentencing context, a defendant must show: (1) the evidence at the sentencing hearing was closely balanced; or (2) the error was so egregious that defendant was denied a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under the plain error doctrine, a defendant must first show that a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In this case, however, the trial court did not err, so neither the application of the relaxed a forfeiture rule nor a plain error review is warranted.

¶ 34     "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *Id.* Here,

15

when the trial court's comments are viewed in context, there is no indication of a bias or prejudice against defendant or in favor of the State during sentencing.

¶ 35    In context of the sentencing hearing, section 6(a) of the Rights of Crime Victims and Witnesses Act provides:

> "A crime victim shall be allowed to present an oral or written statement in any case in which a defendant has been convicted of a violent crime ***. The court shall allow a victim to make an oral impact statement if the victim is present in the courtroom and requests to make an oral statement. An oral statement includes the victim or representative of the victim reading the written impact statement. The court may allow persons impacted by the crime who are not victims under subsection (a) of Section 3 of this Act to present an oral or written statement. ['Crime victim' or 'victim' in the case of an adult deceased victim means '2 representatives who may be the spouse, parent, child or sibling of the victim, or the representative of the victim's estate' (725 ILCS 120/3(a)(3) (West 2016).] A victim and any person making an oral statement shall not be put under oath or subject to cross-examination. The court shall consider any impact statement presented along with all other appropriate factors in determining the sentence ***." 725 ILCS 120/6(a) (West 2016).

¶ 36    Contrary to the defendant's contention, the record in this case does not indicate a bias in favor of the State or against defendant. Rather, it appears from the record that the victim's family was having an extremely difficult time reading their statements to the court. The trial court's statements were made in the context of Joslyn's family members struggling to complete their statements to the court, statements which the trial court could consider in determining the

16

sentence. See *id.* We also note that the trial court's conduct and its statements toward Joslyn's family members were not made before a jury. See *People v. Sims*, 192 Ill. 2d 592, 636 (2000) (judicial comments can amount to reversible error if the defendant establishes that the comments were a material factor in the conviction or had a probable effect on the jury's verdict). Furthermore, when stating defendant's sentence of life in prison, the trial court noted defendant's exceptionally brutal and heinous behavior and his criminal history. There was no indication the sentence imposed was based upon a bias in favor of the State or against defendant.

¶ 37        Additionally, although the prosecutor had argued that the defendant's actions "caused harm," we find no error or display of bias by the trial court clarifying comments made by the prosecutor. The trial court's statement did not demonstrate an impermissible bias but an effort to make an accurate record, which clearly shows the trial court did not consider harm to the victim as an aggravating factor.

¶ 38        Finally, contrary to defendant's contention, the trial court's statement that "[s]ome people like to live in a garbage dump" was not made in reference to defendant. Our review of the record indicates that this statement was made to the mother of the victim in reference to any comments she may have "ever read" about her daughter that did not accurately reflect Joslyn. The statement alluded to the fact that the victim's mother felt she had to defend the victim's character because the victim had been murdered during an "indiscretion." Thus, the record does not support defendant's claim that the trial court had referred to him as or considered him to be "garbage."

¶ 39        We, therefore, conclude that based on this record, defendant has failed to meet his burden of overcoming the presumption of the trial court's impartiality. See *Faria*, 402 Ill. App. 3d at 482.

¶ 40                                    III. CONCLUSION

17

¶ 41    The judgment of the circuit court of Will County is affirmed.

¶ 42    Affirmed.

---

**No. 3-16-0350**

---

| | |
|---|---|
| **Cite as:** | *People v. McKinley*, 2020 IL App (3d) 160350 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 14-CF-1758; the Hon. Carla A. Policandriotes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, Jasmine D. Morton, and Kelly A. Krapf, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---