2021 IL App (1st) 181309-U

No. 1-18-1309

Order filed September 21, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 1205 |
| | ) | |
| CORNELL MCWILLIAMS, | ) | The Honorable |
| | ) | Stanley L. Hill, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: The trial court's factual findings comported with the counts for which defendant was convicted but the court lacked the authority to require defendant to register as a sex offender and the sentencing proceedings were influenced by unfavorable media coverage prior to sentencing.

¶ 2    Following a bench trial, defendant Cornell McWilliams was found guilty of vehicular invasion and burglary, for which he received concurrent 30-year sentences. He was acquitted of

several sex offenses. On appeal, defendant asserts that the evidence was insufficient to sustain his convictions, the trial court lacked the authority to require him to register as a sex offender, and the media improperly influenced his sentencing proceedings. For the following reasons, we vacate the order requiring defendant to register as a sex offender, vacate his sentence and remand for a new sentencing hearing. We otherwise affirm the court's judgment.

¶ 3                                    I. Background

¶ 4                                       A. Trial

¶ 5     On December 21, 2016, defendant, without invitation, entered victim K.A.'s car while she was inside it. The State proceeded to trial on two counts of vehicular invasion, two counts of burglary and six counts of aggravated criminal sexual abuse. Specifically, the charges against defendant alternatively alleged that he entered the vehicle with the intent to commit (1) criminal sexual abuse or (2) aggravated battery. The charges also alleged that defendant touched K.A.'s breast or her "sex organ." At trial, defendant asserted that he entered K.A.'s car with only the intent to commit theft and denied touching her inappropriately.

¶ 6     The evidence at trial showed that shortly before defendant's encounter with K.A. that December day, he encountered Angela Resto at Octapharma Plasma. Resto testified that she was taking defendant's vitals when she noticed that a blood vessel in his eye had burst. When defendant was informed that he could not sell his plasma that day, he repeatedly demanded to be paid and refused to leave. Resto threatened to call the police, but defendant said he did not care. Ultimately, the police removed him from the premises. Defendant next encountered K.A.

¶ 7     K.A., then 26 years old, testified that she was putting gas in her white Mazda Miata at a gas station in the Village of Northlake when defendant approached her. She described him as a tall black man wearing sweatpants, a sweatshirt, a beanie and glasses. Defendant asked if she

"had a square," which she understood to be a cigarette, and she told him she did not smoke. As K.A. stood by the open driver's side door of her car, defendant told her she "looked good" and walked toward her. He asked for her phone number, but she said she had to leave. Despite being rebuffed, defendant continued to approach her and insisted that she give him her phone number. Once K.A. had sat down in her car, he reached his phone over the door for her to enter her number. She repeated that she needed to leave and closed her door.

¶ 8      When K.A. turned on the car, defendant opened her door and leaned in. He said, "Give me a kiss," and attempted to kiss her. Most of his upper body was inside the car and she saw that he had a burst blood vessel in one eye. When defendant placed his left hand on her vagina, she tried to push him off of her, saying "Please stop. Leave me alone." Defendant repeated, "Give me a kiss." K.A. pushed defendant off of her but he grabbed her vagina a second time.

¶ 9      After managing to push him out of her car, she braced her body so that he could not get in and she screamed for help. Despite her protests, defendant touched her breasts. She managed to honk her car horn with her elbow, but he attempted to pull her out of the car by her jacket, saying, "Get the F[uck] out of the car." As she continued honking and screaming, she made eye contact with a civilian, who approached and spoke to defendant. Defendant told the civilian to go ahead and call the cops, as he did not care. When a second civilian arrived, defendant reversed course and tried pushing K.A. into her car. The second civilian yelled at defendant, who was telling K.A. to move over. Defendant briefly let go of K.A.'s jacket, allowing her to move the car forward, close the door and drive away.

¶ 10    K.A. spoke to the 911 dispatcher from the parking lot next door and returned to the gas station once the police arrived. She testified that during her brief conversation with the police at the gas station, she did not mention that defendant tried to kiss her. Rather, she first mentioned it

at the police station. The 911 call, in which K.A. said defendant had inappropriately touched her, was played in court, as was the gas station surveillance video. The testimony of Ken Bailey, the first civilian to assist K.A., corroborated several aspects of her account.

¶ 11    Before the had police arrived at the scene, defendant went inside the gas station. Manager Alberto Sanchez testified that he saw defendant "disturbing [*sic*] inside the store." Defendant, standing in front of the cash registers, pulled down his pants and showed his penis, which was not erect. In a "smooth voice," he told Sanchez to touch his penis. When Sanchez asked defendant to leave, he repeated himself. At one point, defendant took a banana and ate it. Defendant eventually left the building but continued to expose himself outside.

¶ 12    Officer Kruschke testified that he did not recall whether K.A. alleged that defendant said "Give me a kiss" and the officer did not memorialize that allegation. The parties also stipulated that Detective Wajnicz would testify that when he and Assistant State's Attorney Knight interviewed K.A., she provided the same information she had provided Detective Kruschke.

¶ 13    Defendant, then 31 years old, testified that prior to his incarceration, he lived with his mother and worked about three times a month for a temporary employment agency. On the day in question, he attempted to sell plasma for $40 but was turned away because he appeared to have an eye infection. Defendant acknowledged that he became aggressive. After the police removed him from that facility, he went to the gas station and purchased a cigar for 50 cents. He then saw K.A., who he found to be attractive, and asked her for a cigarette. Defendant also told her she looked good and asked for her phone number because he wanted to take her on a date. Defendant denied that he became aggressive when she declined.

¶ 14    Defendant testified that he had, however, seen a wallet in the console of K.A.'s car. He opened her door and tried to grab the wallet, but she was pushing him off. He did not perceive

that she was scared, although he acknowledged she was screaming. Defendant denied grabbing her breasts or vagina, trying to kiss her or saying, "Give me a kiss." Furthermore, he denied trying to get her in or out of the car. While he and K.A. tussled, Bailey asked defendant what he was doing, which led to an argument. When Bailey threatened to call the police, defendant left K.A. alone. He denied saying he did not care if the police were called and did not recall a second civilian appearing at the scene. Defendant testified that K.A. fled before he could get her wallet.

¶ 15    Defendant then went inside the gas station and took a banana. The employee behind the counter wanted him to leave due to the altercation outside. In addition, defendant was angry and disappointed that he did not get the wallet and angry regarding his dispute with the employee. He testified, "I had released my penis and just told [an employee] to suck my penis." Defendant did not actually want the employee to do that, however. Defendant acknowledged that the surveillance video showed his penis was outside of his pants before he entered the gas station. While defendant denied that he was masturbating or stroking his penis, he acknowledged that the surveillance video showed his hand "clearly moving back and forth on the shaft of [his] penis."

¶ 16    The State presented certified copies of defendant's 2008 conviction for the manufacture or delivery of cannabis (08 CR 01733(01)), his 2009 conviction for aggravated robbery (09 CR 18864), his 2013 conviction for possession of a controlled substance (13 CR 15877(01)), and his 2014 conviction for merchant retail theft (14 CR 15530).

¶ 17    The trial court found that K.A. was "very credible," but also accepted defendant's testimony that his conduct was not sexually motivated. The court found that he entered or reached into K.A.'s car with the intent to steal and to commit aggravated battery, not to obtain sexual gratification:

"I don't view [defendant's] goal as being sexual gratification that day. I didn't see it. I didn't see that. Clearly she was correct when she says that he grabbed her breasts, his hand grabbed her vagina twice, but I view that as his attempt to try to get the wallet."

The court emphasized that the case presented a question of intent:

"Was he there trying to get sexual gratification, or was he there trying to commit a robbery, again, trying to startle and confuse the complainant to the point of where he was able to get the wallet? I think his goal was to try to get the wallet."

Furthermore, the court found defendant's gross, bizarre conduct in the gas station was intended to get the employees to back off. It was not masturbation.

¶ 18    The trial court found defendant guilty of the counts charging him with vehicular invasion (count 2) and burglary (count 9) by entering K.A.'s vehicle with the intent to commit aggravated battery. The court acquitted him of the remaining offenses. Moreover, the court identified the touching of K.A.'s breasts and vagina as insulting or provoking conduct that would have led the court to find defendant guilty of aggravated battery had the State not nol-prossed that count.

¶ 19                          B. Post-Trial Proceedings

¶ 20    On July 20, 2017, CBS 2 ran a news story that questioned why defendant was not convicted of a sex offense. According to CBS 2, the trial court's ruling angered K.A. and the Village of Northlake Police Chief, who stated, "it's disappointing because it's important that convicted sex offenders publicly register their address." The story noted that defendant had 79 prior arrests and a Scrooge McDuck tattoo on his forehead.

¶ 21    At a hearing four days later, apparently attended by CBS 2 reporters, the trial court tendered the presentence investigation (PSI) report to the parties. The State then filed K.A.'s victim impact statement and tendered case law that, according to the State, authorized the court

to require defendant to register as a sex offender, despite having acquitted him of the sex offense charges. The case was continued.

¶ 22    The PSI report tendered that day stated that defendant was adjudicated delinquent six times, largely for the possession of cannabis. His 21 adult convictions included cannabis related offenses as well as drinking alcohol on the parkway, battery, aggravated robbery, gang loitering, criminal trespass to a vehicle, theft, criminal damage to property and possession of a stolen motor vehicle. In addition, defendant, a former Vice Lord, was shot in 2005. He began using marijuana at age 11, PCP at age 14 and ecstasy at age 19. Although he had not smoked marijuana since 2008, he used PCP and ecstasy two to four times per week. Defendant participated in substance abuse treatment while on juvenile probation and desired treatment again. According to defendant, he was arrested in the ninth grade and never returned to school. Before then, he was repeatedly suspended for fighting and other behavioral issues. He took GED classes in prison but was released before taking the exam. Defendant reported having a fair childhood, free of abuse, and claimed to be his diabetic mother's caretaker. He spent all of his time with her and had no close friends.

¶ 23    In her victim impact statement, K.A. stated that the courtroom proceedings "were almost as tragic as" what occurred during the offense. She stated, "Mr. McWilliams sexually attacked me that day. Plain and simple!" In addition, her car did not have a center console and she had not had a wallet that day, as her license and credit card were inside her pants pockets. "Until someone attacks you and grabs your sexual organs and plays it off as they were simply trying to 'rob' you[,] [y]ou will never feel the pain I'm waking up with every single day." K.A. stated that defendant had stolen her pride in the judicial system, and that she hoped he would be "punished for the crime he committed, not just for the crime he was convicted of."

¶ 24 At some point *before* sentencing, the court typed an extensive nine-page, single-spaced order that (1) denied defendant's motion for a new trial, (2) imposed two concurrent maximum 30-year sentences, and (3) ordered defendant to register as a sex offender.

¶ 25 Although the court had previously believed defendant's testimony that he was not seeking sexual gratification on the day in question, the court's sentencing order found only that "the State did not *prove beyond a reasonable doubt* [that] defendant's touching was sexual touching." (Emphasis added.) The court noted that K.A.'s statements to police did not corroborate her testimony that defendant said, "give me a kiss." In determining whether a defendant was sexually motivated and required to register as a sex offender, however, a lower standard applied. Under this lower standard, the State had shown that defendant's conduct was sexually motivated, through K.A.'s testimony and defendant's own admission that he revealed his penis inside the gas station. The trial court had stated after trial that it "did not view [defendant's conduct] as masturbation." In contrast, the sentencing order found that defendant "was observed masturbating." The court speculated that while defendant lacked an erection, he may have had erectile disfunction. The court also speculated that defendant's "sexual confidence and satisfaction is restored and he is erotically thrilled, empowered and stimulated by kinky domination and commandeering of females by force and taking their valuables in a sadistic sexual rage. Who knows for sure?"

¶ 26 With respect to sentencing, the order noted defendant's education, his criminal history, his desire for drug treatment and the facts of the crime: this "was an unplanned irrational crime of opportunity." According to the order, the case involved sex and emotion, but drug addiction and poverty were the primary motivating factors:

"He is a drug addicted, robbery and theft felon who unsuccessfully tried to snatch and grab valuables in an insulting and provoking manner from an innocent woman whom he terrorized. The post-traumatic consequences for [K.A.] were devastating. Defendant's conduct was reprehensible and appalling."

In aggravation, the court found that defendant threatened serious harm, that he had a criminal history and that the sentence was necessary to deter others. The court found no mitigating factors.

¶ 27    On September 7, 2017, with the written order in hand, the trial court commenced the hearing on defendant's motion for a new trial as well as sentencing.[1] According to an uncontradicted representation later made by the public defender, those in attendance included CBS 2 reporters, a sketch artist and the Village of Northlake Police Chief. The trial court denied defendant's motion for a new trial and proceeded to sentencing.

¶ 28    K.A. read her victim impact statement. The State then argued in aggravation that due to his criminal background, defendant was required to be sentenced as a Class X offender and deserved the maximum 30-year sentence on each count. Despite having a strong family background, defendant had joined a gang, regularly used PCP and ecstasy, and had failed to follow through on drug treatment. He also relied on his mother for housing and financial support. Furthermore, "his testimony was rampant with lies, was clearly planned, and was motivated in efforts to separate himself from the counts that involved the sex offenses." The State urged the court to find defendant's actions were sexually motivated:

"And, although your Honor found that the defendant's activities were not for the purpose of sexual gratification, that does not preclude you from the ability to do the right

---

[1]This hearing apparently lasted more than three hours, with the majority of the hearing devoted to the question of whether defendant could be required to register as a sex offender.

thing now. The right thing for the victim, the right thing for the community in which we all serve, and the right and the just thing for the defendant, what he has earned. 30 years in the Illinois Department of Corrections. And upon his release that he register[] as a sex offender."

¶ 29    Defendant's mother testified on his behalf that she had a physical disability and her son helped her with "getting [it] together." He cleaned on the weekends, prepared meals and helped her walk. She testified that after defendant was arrested, "I got well, and I started going to the doctor with transit and got on the bus." Upon defendant's release, he would return to live with her and help around the house. In elocution, defendant asked for drug treatment so he could be a productive member of society and a good son. He apologized and asked for mercy, stating that he had reflected on his stupidity and mistakes: "Instead of thinking before I react, my selfish ambitions led me to destruction." Finally, defense counsel argued that defendant grew up without a father and had not chosen to be poor. He was admittedly addicted to drugs and wanted treatment. Counsel sought the minimum six-year term and argued that the court lacked the authority to require defendant to register as a sex offender.

¶ 30    At the conclusion of the hearing, the court stated:

"Now, I've got a written opinion, and I've got ten copies of it. So whoever wants a copy of it can get it and read it and find out why the Court did what it did so that you can have the specifics of what this Court did and understand what this Court did, and not speculate about what this Court did or is doing."

The court then read its written sentencing order into the record.

¶ 31    On the same day, CBS 2 ran another story: "Judge Throws Book at Serial Offender After [CBS] 2 Investigator[']s Report." The report stated that in "[a] stunning about face," the court

ordered defendant to register as a sex offender and imposed a "stiff" 30-year sentence after previously acquitting him of a sex crime. The acquittal "normally would have gotten McWilliams off the hook for registering as a sex offender," making the court's decision unprecedented. According to Irv Miller, CBS 2's legal analyst, "the media scrutiny had an effect on everyone in the courtroom." K.A.'s mother stated, "I'm glad that he did right today." The report noted that defendant pleaded for mercy but received none.

¶ 32     Defendant then filed a motion to reconsider arguing that his sentence was excessive, that the court erroneously ordered him to register as a sex offender, and that CBS 2's first story about the case denied him a fair sentencing hearing. At the hearing on that motion, defense counsel argued that a 30-year sentence did not correspond to a defendant whom the court had previously characterized as "a common robber, a common thief and a nitwit, and who you originally found did not commit these crimes for the purpose of sexual gratification." The court responded, "I said, beyond a reasonable doubt. That's what I said. I didn't find it beyond a reasonable doubt."

¶ 33     In response, the State was indignant that defense counsel implied the court submitted to media pressure. The State argued that the media was regularly present in courtrooms without influencing judges and that only one media outlet had been present in defendant's case. The State also argued that the court was "well able to rise above the fray" and to "un-ring the bell, to un-see what's been seen, to not hear what has been heard." Furthermore, defense counsel was merely confusing the different standards that applied at trial and at sentencing. According to the State, defendant was the "poster boy" for the maximum sentence.

¶ 34     The court denied defendant's motion to reconsider, responding to many of defendant's arguments. The court did not, however, directly respond to defendant's allegations that the media influenced his sentence. In addition, the court stated:

"I am not going to reduce the sentence. I thought long and hard on that. I thought

long and hard on it. I suspect that you are not going to find many judges, no offense to

the judges in Cook County, but you are not going to find many that are going to do a ten

page opinion prior to sentencing in a case. They may. I don't know. But I did because I

respect the role that I have been put in and I take it seriously."

¶ 35                                    II. Analysis

¶ 36                                    A. Intent

¶ 37    On appeal, defendant first asserts that we should vacate his convictions for vehicular

invasion and burglary. Although the counts that defendant was convicted of alleged that he

entered K.A.'s vehicle with the intent to commit aggravated battery, defendant contends the

court did not find that he had that intent. He characterizes this as a challenge to the sufficiency of

the evidence.

¶ 38    When deciding whether the State's evidence was sufficient to prove the defendant guilty

beyond a reasonable doubt, reviewing courts must determine whether any rational trier of fact,

when viewing the evidence in the light most favorable to the State, could have found the

essential elements of the crime proven beyond a reasonable doubt. *People v. Wise*, 2021 IL

12392, ¶ 27. In making this determination, we defer to the trial court's credibility findings and

reasonable inferences drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 39    "A person commits vehicular invasion when he or she knowingly, by force and without

lawful justification, *enters or reaches into* the interior of a motor vehicle while the motor vehicle

is occupied by another person or persons, *with the intent to commit therein a theft or felony*."

(Emphases added.) 720 ILCS 5/18-6(a) (West 2016). Additionally, "[a] person commits burglary

when without authority he or she knowingly *enters* *** a "motor vehicle *** *with intent to*

*commit therein a felony or theft.*" (Emphases added.) 720 ILCS 5/19-1(a) (West 2016). Thus, the elements of these offenses require that defendant enter or reach into K.A.'s car with the specific intent to commit theft *or any other felony.* These offenses do not require, however, that a defendant enter with the specific intent to commit any particular felony. See *People v. Alexander*, 190 Ill. App. 3d 192, 196 (1989) (stating that a trial court's finding of guilt for burglary "will be sustained if the evidence supports the finding that the defendant intended to commit any felony"); see also 720 ILCS 5/2-7 (West 2016) (defining "Felony" as an offense for which a defendant may be sentenced to one year or more in prison; *cf. People v. Toolate*, 101 Ill. 2d 301, 308 (1984) (stating that where the predicate of rape was the only underlying felony charged and at issue, the defendant could not be convicted of burglary with intent to commit theft); see also *People v. Payne*, 194 Ill. App. 3d 238, 247 (1990) (recognizing that *Toolate* drew a distinction between burglary with the intent to commit theft and burglary with the intent to commit any other felony).

¶ 40    We question whether defendant has actually presented a challenge to the sufficiency of the evidence. Indeed, defendant concedes that he entered K.A.'s vehicle with the intent to commit theft. Instead, defendant appears to be challenging a perceived variance between the indictment and the proof at trial. See *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 204 (finding that where the defendant argued "the State's proof failed to establish the specific deception alleged in the indictment," the defendant was essentially arguing that the State's evidence fatally varied from the indictment's allegations, not that the evidence was insufficient). To that extent, defendant has forfeited his legal contention by failing to provide a developed argument supported by citation to relevant legal authority. *Oglesby*, 2016 IL App (1st) 141477, ¶¶ 204-05.

¶ 41    Regardless of how defendant's contention is best characterized, it is based on a misunderstanding of the trial court's findings. Following trial, the court expressly stated that it believed K.A.'s testimony that defendant touched her vagina and breasts. The court found , however, that defendant did not do so for the purpose of sexual gratification. Instead, the court found defendant committed vehicular invasion when he "reached into the interior of *** a 2016 Mazda that was occupied [by] K.A. *with the intent to commit therein a felony, to-wit aggravated battery.*" (Emphasis added.) The court similarly found defendant committed burglary when he "entered a motor vehicle, to-wit the property of K.A. *** *with the intent to commit therein a felony, to-wit aggravated battery.*" (Emphasis added.)

¶ 42    While the trial court did not elaborate on why defendant intended to touch K.A. in an insulting or provoking manner if not for sexual gratification, the court's reasoning is sufficiently clear:

> "Was he there trying to get sexual gratification, or was he there trying to commit a robbery, again*, trying to startle and confuse the complainant* to the point of where he was able to get the wallet? I think his goal was to try to get the wallet." (Emphasis added.)

When read in their entirety, the court's findings reflect a determination that defendant entered the vehicle with the intent to commit aggravated battery against K.A. as a means to distract her and obtain her wallet. An intent to commit aggravated battery and an intent to commit theft are not mutually exclusive.

¶ 43    We are also not persuaded by defendant's suggestion that the trial court found defendant formed the intent to commit aggravated battery only after he entered the car, particularly when considering the court's comments as a whole. The court's gratuitous finding that aggravated

battery actually did occur and that the court would have convicted defendant of that count had it not been nol-prossed does not change that assessment.

¶ 44    Accordingly, the evidence supports a determination that defendant entered K.A.'s vehicle with the intent to commit aggravated battery, satisfying the elements of vehicular invasion and burglary.

¶ 45                                    B. Sex Offender Registration

¶ 46    Next, defendant asserts, and the State now correctly concedes, that the order requiring defendant to register as a sex offender must be vacated because defendant was not convicted of a qualifying offense under the Sex Offender Registration Act (730 ILCS 150/1 *et seq*. (West 2016)). Accordingly, we vacate the order requiring defendant to register.

¶ 47                                    C. Sentencing Impropriety

¶ 48    Finally, defendant asserts that the media impacted the court's sentencing decision. He notes, among other things, that the court wrote its nine-page sentencing order before the sentencing hearing began and that this order made statements that were contrary to the court's prior findings.

¶ 49    A trial court is required to conduct a sentencing hearing at which the court must consider aggravating factors as well as evidence and information offered in mitigation. 730 ILCS 5/5-4-1(a) (West 2016). The court must "hear arguments as to sentencing alternatives" and "afford the defendant the opportunity to make a statement on his own behalf." 730 ILCS 5/5-4-1(a)(5), (6) (West 2016). Yet, evidentiary standards are relaxed. *People v. Rose*, 384 Ill. App. 3d 937, 940 (2008). The court may even consider criminal conduct that does not result in prosecution or conviction. *People v. Harris*, 375 Ill.App.3d 398, 409 (2007). Still, sentences must be based on the court's "independent assessment" of sentencing factors. 730 ILCS 5/5-4-1(b) (West 2016).

¶ 50    A defendant also has the constitutional right to an open-minded, unbiased trier of fact. *People v. Jones*, 2017 IL App 143403, ¶ 32. Conversely, a sentencing hearing affected by judicial bias is fundamentally unfair, even if the sentence falls within statutory limits. *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 47. A defendant's right to a fair trial is also violated when the trier of fact prejudges the case (see *People v. Hardin*, 2012 IL App (1st) 100682, ¶ 14) or makes its determination based on information outside the record (*People v. Pellegrini*, 2019 IL App (3d)170827, ¶ 64). "While all judges come to the courtroom influenced, either consciously or unconsciously, by the experiences, associations, and prejudices developed over a lifetime, they are expected to make an effort to put those predilections aside and make determinations based only upon the evidence presented." *People v. Steidl*, 177 Ill. 2d 239, 266 (1997). "If it is shown that the convicted has been prejudiced by the procedure adopted, or material considered by the trial court in conducting its inquiry prior to the imposition of punishment, the resultant penalty will not be allowed to stand." *People v. Crews*, 38 Ill. 2d 331, 338 (1967).

¶ 51    The trial court is presumed to be impartial, however.  *People v. Romero*,  2018 IL App (1st) 143132, ¶ 96. The party claiming prejudice has the burden of overcoming this presumption. *People v. McKinley*, 2020 IL App (3d) 160350, ¶ 34; *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 14. To do so, a defendant must show something more than an unfavorable result. *Rademacher*, 2016 IL App (3d) 130881, ¶ 47. That may be animosity, hostility, ill will or distrust. *Id*. Furthermore, the presumption that the court considered only appropriate evidence is rebutted "when it affirmatively appears that the trial court was misled or *improperly influenced* as would be indicated by a judgment or sentence contrary to the law or the evidence." (Emphasis added.) *People v. Collins*, 21 Ill. App. 3d 800, 805-06 (1974). Moreover, Prejudice is ordinarily

proven by circumstances, not direct positive evidence. See *People v. Robinson*, 18 Ill. App. 3d 804, 807 (1974). We review this issue *de novo* (*Romero*, 2018 IL App (1st) 143132, ¶ 96), considering alleged bias or prejudice in the context of the trial judge's specific reaction to the events occurring (*People v. Urdiales*, 225 Ill. 2d 354, 426 (2007)).

¶ 52    At trial, the court believed defendant's testimony that his goal was to obtain K.A.'s wallet, albeit with the assistance of some aggravated battery, and categorically rejected the notion that defendant was seeking sexual gratification. The propriety of the latter determination is not before us. See *People v. Hull*, 2020 IL App (3d) 190544, ¶ 7 (stating that the prohibition against double jeopardy protects a defendant from a second prosecution for the same offense after acquittal). Yet, this sentencing issue requires us to acknowledge that the court did not merely find that the State failed to prove defendant's goal was sexual *beyond a reasonable doubt*.

¶ 53    CBS 2's subsequent coverage then criticized the decision to acquit defendant of any sex offense and the record strongly suggests that the court was aware of that before sentencing. Specifically, CBS 2's report said that it left the trial judge messages, albeit messages that were not returned, and CBS 2 reporters had apparently attended proceedings in this case. The court's later comment about eliminating the need for individuals to speculate regarding the court's reasoning also show that the court was aware of the unfavorable coverage. We would be remiss not to consider that before the sentencing hearing, the court had also been given K.A.'s victim impact statement, which similarly expressed her displeasure that the court acquitted defendant of a sex offense. She stated that defendant stole her "pride in the American Judicial System" and that "[u]ntil someone attacks you and grabs your sexual organs *** [y]ou will never feel the pain

I'm waking up with every single day." She asked that defendant be punished for the crime he committed but was acquitted of.

¶ 54    At some point before the sentencing hearing, the trial court took the admittedly unusual step of typing a lengthy, detailed sentencing order, an act which also suggested that the court was aware of the CBS 2 coverage. Additionally, this order went beyond tentative musings. *Cf. People v. Gallo*, 54 Ill. 2d 343, 355 (1973) (finding no error in arriving at tentative factual conclusions prior to closing argument). The order found that while the State had not proven beyond a reasonable doubt that defendant's conduct was sexually motivated, the evidence was strong enough to find defendant's conduct was sexually motivated for the purpose of sentencing and sex offender registration. Although courts can and do draw such distinctions, the court's prior categorical findings were inconsistent with drawing such a distinction in this case. Additionally, the sentencing order stated that there were no factors in mitigation even though defendant had not yet been given the opportunity to present or argue factors in mitigation, as the sentencing hearing had not occurred at that point. While the court did not issue the order prior to the hearing, it left no indication that the court's mind was still open.

¶ 55    The sentencing hearing that subsequently ensued was lengthy, but it was largely dedicated to the matter of sex offender registration, not defendant's sentence. Additionally, the court's comments regarding defendant's conduct struck a tone decidedly less favorable to defendant. At the hearing's conclusion, the court stated:

>    "Now, I've got a written opinion, and I've got ten copies of it. So whoever wants a copy of it can get it and read it and find out why the Court did what it did so that you can have the specifics of what this Court did and understand what this Court did, and not speculate about what this Court did or is doing."

As stated, these statements were clearly a response to CBS 2's prior report. We further note that when the court denied defendant's motion to reconsider, the court responded to several of defendant's contentions but did not specifically deny or otherwise respond to, the allegation that the media had influenced the court's sentencing decision. *Cf. Gallo*, 54 Ill. 2d at 354-55 (stating that while a newspaper article's comment could potentially impair a defendant's constitutional right to a fair trial, the trial court properly denied the motion for a mistrial where the judge acknowledged reading the article and stated he was not intimidated by it); *People v. Little*, 2018 IL App (1st) 151954, ¶¶ 1-2, 99 (finding no due process violation where the trial court prematurely made a finding of guilty before the defendant had the opportunity to make a closing argument but then acknowledged its inadvertent error, reopened the case and promised to keep an open mind); see also *People v. Sumner*, 40 Ill. App. 3d 832, 838-39 (1976) (finding it improper for the trial judge to consult with members of the public to determine whether probation or conditional discharge would deprecate the seriousness of the offense, which denied the defendant the opportunity to challenge bias behind the opinions).

¶ 56    The State correctly argues, as it did below, that courts routinely maintain impartiality despite media presence or commentary. Yet, considering the record as a whole, defendant has shown that the trial court, whether consciously or unconsciously, was influenced by CBS 2's coverage. Accordingly, we vacate defendant's sentence and remand for a new sentencing hearing before a different judge. See *People v. Wardell*, 230 Ill.App.3d 1093, 1102 (1992) (stating that the defendant is entitled to a new sentencing hearing where the trial court relied on an improper factor or made comments indicating it did not consider the requisite statutory factors); see also *People v. Hooper*, 133 Ill. 2d 469, 513 (1989) (stating that "[a] judge, of course, should be disqualified from hearing a case where he has prejudged it in favor of one of the parties"). In

light of our determination, we need not address defendant's contention that his 30-year sentence was excessive. The full statutory sentencing range will be available to the trial court on remand.

¶ 57                                    III. Conclusion

¶ 58        Here, the trial court's findings and evidence supported defendant's convictions for vehicular invasion and burglary. We vacate the order requiring defendant to register as a sex offender, vacate defendant's sentence, and remand for resentencing before a different judge.

¶ 59        Affirmed in part and vacated in part.